Case number 17-5114. Jefferson Morley Appellant v. Central Intelligence Agency. Mr. Lessard for the Appellant. Mr. Peterson for the Athlete. Good morning. Judge Henderson is participating and should be on the line by audio. Judge Henderson, are you there? I am. Thank you. Okay. Good morning. You may proceed. Good morning, Your Honor. I just wanted to allude briefly to the fact that on March 12th we submitted a Rule 34-1I submission and it's been distributed to you. It relates to the public benefit issue in particular, which I'm going to come back to later. I want to take things out of sequence and deal with Exemption 4 first. But just briefly, Judge Leon's decision did not refer to the photographs that were obtained in the course of this litigation. As there's an old saying that a photograph is worth a thousand words, the crux of the ex-ante analysis that Judge Leon was to do is the identity of George Ioannidis' CIA case officer. And the photographs are critical to that. But I really want to begin with the fourth factor. The case was this Court very carefully crafted the remand for Judge Leon to consider all four factors. And he was to, in exercising his discretion, was to evaluate them overall and determine whether or not they favored an award of fees for Morley. Strangely, Judge Leon found that three of the four factors favored Morley, but he concluded only by a tiny bit. And therefore, he would rely upon the fourth factor. As he said, thankfully we can break the tie by turning to the fourth factor. What's wrong with a district judge weighing the factors as he or she sees fit? We haven't told the district court how to balance them. He can weigh the factors. The only problem is that he must do it according, in a principled fashion. If he violates the law himself, then he runs afoul of the discretion standard. And that's what happened here. If you take the fourth factor, he says that the fourth factor is dispositive. He makes it dispositive. It's the one that counts. But this Court has said, and in the past Judge Leon himself conceded, that the no one factor is dispositive. So right off the bat. So let's talk about factor four before we come to the balancing point. What's wrong with his analysis that a lot of the agency positions asserted in this case either ultimately prevailed or were at least reasonably defensible? Well, neither is true and he ignored the standard which was set down by the Davey case. He was supposed to evaluate matters in terms of the Davey case. And the Davey case said that the agency cannot shift the burden, even if it has a colorable basis, for maintaining that it did things lawfully. That it can't shift that burden to the requester. Fair enough. But in this case, he made the determination that the agency positions were defensible. Yes, but in fact, they are not defensible. Which, I mean, they asserted a bunch of exemptions. Yes. And we found that the justifications weren't adequately developed on the first appeal. Or second appeal. It went back. There was further development. And then we affirmed the exemptions by judgment. The Glomar defense was ultimately upheld. The failure to search the operational records they lost on, but it was an issue of first impression. But the problem is that there are problems with all of those. The first is that there's black and white letter law here. If you violate the statutory deadline for making a determination and you release stuff long after you should have made the determination, then under the Davey precedent, that's an abuse of discretion. And that happened with respect to basically all of the exemption claims. In addition, the law requires that you respond to the request in front of you. They did not make it and do it in a timely fashion. They did not do it in a timely fashion. And it's irrational. There's no reasonable basis why they couldn't have done it in that time if they had simply followed the law that said you've got to do it in this time. The same thing is true of the Glomar defense. I take your point about delay. The statutory deadline is, what, 20 days? It's varied over time. In my experience, agencies never meet that deadline. Are there cases that award fees simply because the agency misses the 20-day deadline and then a case is filed? I believe there are, but I cannot pinpoint one at the moment. Well, in the Davey case, the court held that the agency had failed to meet the deadline. And so, yes, there is precedent for that. That wasn't after the statutory 20-day time frame. That was after the litigation had been filed. Pardon? That wasn't after the 20-day deadline. Davey didn't refer to that. It referred to after the litigation had been filed, at least as I read Davey. Yes, they do refer to that, but I believe there is mention of the time period in that decision. The court is, the decision is, assuming that there's a colorable basis for some of this, the rational thing to do, if the CIA, for example, they didn't direct the, they directed the request, they directed Morley to file the request with another agency. They had an obligation under the statute to pursue that request. They didn't do it. And that was an obstacle that prevented Morley from timely getting information that he should have had. With respect to the Glomar defense, they initially didn't invoke it, and then later they came back and said that the review board had invoked it. But the fact is that they were simply not telling the truth. The Glomar defense should have been invoked from the outset if what they are claiming now is true was true. But it wasn't. So you go through each of these. Then with respect, for example, to Exemption 2, we had an entire remand that was due because the agency refused to recognize the impact of the Milner decision on Exemption 2. It changed the standard for Exemption 2 after three decades of this circuit applying a different standard. And this issue came up during the mediation process. We pointed out that the Exemption 2 had changed, that Milner had changed the standard for Exemption 2. We went through a whole separate appeal, the only issue of which was Exemption 2, and it was remanded and we got additional information under Exemption 2 at that time. So the same thing happened with respect to Exemption 6, where they initially withheld the name of Mrs. Joannides, Joannides' wife and relatives, claiming that she invaded her privacy. Well, in fact, she was deceased. They had an obligation under the law to determine whether or not she was deceased. We called it to their attention they did so. So there is case after case in which you cannot say that there was a rational basis for delay and for obstruction of the request. Now, with respect to Exemption 1, the district court was obligated under this court's remand to engage in a fresh analysis of, a fresh ex-ante analysis of the public. Factor 1, right. Factor 1, yes, under Factor 1. And he concedes that, in fact, Morley is a journalist and that he was looking for information. The subject is the Kennedy assassination. But he then gets away from the ex-ante and goes into an analysis, which is the same old analysis based on the results of the documents. He gets off into the travel documents and argues that Morley's evidence does not meet the decent chance standard under the ex-ante analysis. But he's not applying ex-ante. The ex-ante analysis requires him to look at the request. The primary things are, one, the journalist, he is a journalist. He, therefore, fits under the preferred category of requesters. He ultimately gives you credit for that, though. He gives it, but he takes it away, and he doesn't give what he needs. This is a major factor. When you establish that, unless you can show that the request was frivolous or trivial, then you are presumed under circuit law to be able to get attorney's fees. That's the presumption. You have to show that it's trivial or frivolous, and obviously this request was not trivial or frivolous. It was supported by a journalist who obviously had a mastery of the subject, who knew what he was looking for and knew that the records. He was looking for information about the JFK assassination, correct? He was looking about information on George Ioannidis, a CIA case officer. Which he said would be relevant to the assassination. Yes, which in some measure he felt would be relevant to the assassination controversy, meaning that the controversy over whether or not Oswald had a relationship with the DRE, with Cuban exiles, whether or not he had a financial relationship with the DRE, which was the organization. Right. Here is a really important point, is that, as I say, the point of this request was to secure the identity of George Ioannidis. Then you can argue the public, the information is out, the public can go back and forth and decide how to evaluate it. But it's clearly potentially of great public benefit, regardless of whether or not you find that there was definitely a connection or whether you disprove that there was a connection. What is the connection? You've established the identity of the agency officer who arguably had a covert relationship with a particular group. How does that tie into the Kennedy assassination? Because that group was suspected of having been involved in the Kennedy assassination. The Cuban exiles, it was, first of all, it was a CIA-funded, it was by far the most well-funded CIA exile organization. It was the boldest of the CIA organizations. It was engaged in propaganda operations against Castro. Lee Harvey Oswald was part of that. The first news that breaks after the assassination has to do with Lee Harvey Oswald, with the DRE. Immediately upon the word of the assassination, they contact Ioannidis, their case officer, who never admitted it until this lawsuit forced that disclosure. They contact him and want to know if they can proceed with this tape that they had made of Oswald and one of their members, Carlos Regnier, before the assassination. And Ioannidis tells them, yes, give me a little time. I'll check with headquarters and get back to you. They went ahead and ran it anyway, and so that guarantees that it's on headlines around the world the next day. It is the original conspiracy theory. I think we have your argument on that point. We'll give you some time on rebuttal. We'll hear from the government now. You're over your time. Thank you, Your Honor. May it please the Court. I'll start with an analysis of Factor IV. That's what the appellant started with. And in that analysis, I believe that the district court provided the proper framework in which to view the government's behavior, which is not whether the government was ultimately correct on each position it took. That is not the standard. The standard would be whether or not there was an evidence of abdurancy. How does this case differ from Davey? In the sense that the positions that the defendant took in this case were either issues dealing with first impression cases, where there were no law on the issue of searching operational files, and factually dealing with the request. The request itself indicated that it was interested in the connection between the CIA, Mr. Giornides, and the JFK assassination. Upon reading the request, a reasonable interpretation of that request would be one where the JFK Act records would be activated. What is the justification for, what is the reasonable justification for the agency saying, these records are publicly available through NARA, and therefore we don't have to search our records? That's the one piece that troubles me, because tax analysts have been on the books for 20 years saying that an agency can't avoid its FOIA obligations by saying that records in their files are available, publicly available, or in another agency's files. Right. Understood, Your Honor. The one factor different from tax analysts and Davey, for the large part, is that at the time of Mr. Morley's request, there was a significant effort by the CIA to populate the JFK Assassination Act files, pursuant to a statute. That statute had a purpose. The JFK statute. Yes, yes. And in that case, it was specifically meant to allow the CIA, in this case, to refer requesters to this reservoir of documents. There had been significant efforts made to make that particular repository of documents complete. So upon seeing a request that specifically and explicitly references the assassination, it was a reasonable interpretation to think that those records would be found in that repository. Is there any? As it turns out, hundreds of them were. Yes, Your Honor. And that was a result of, many of that was a result of searching the operational files of the CIA, which had to that point previously not been addressed in this circuit. And so other documents were produced as a result of the new precedent that was formed by this court. But it didn't mean that at the time of receiving the request, that there was an effort of abdurancy or unreasonableness in interpreting that request to be attended to the JFK Act. Is there anything in the JFK Act that would support an argument that the general rule of tax analysts doesn't apply here because Congress has set up this special scheme for JFK requesters to go through NARA? I don't believe that that was specifically addressed. The tax analyst precedent was specifically addressed in the Act itself. I haven't read anything along those lines. I will say, though, that the whole reason of the actual Act is to provide one location for requesters to go and to search for these particular documents. And I don't believe that even in that case that there was any effort by the CIA to dissuade any requester from continuing to request of the CIA any other documents they felt were not in the JFK files. And there was never a proposition by the CIA that FOIA requesters could not request these documents from the CIA. And then to follow up on Judge Henderson's question, the documents that were in your files and not produced to NARA, were those all in the operational records? Are those all operational records? In other words, were there any records in your files not produced to NARA but not arguably protected by the operational records provision? My understanding, Your Honor, is that the records that were produced, the vast majority of them were from the operational files. In terms of whether there was any overlap. But not all, right? Not all. There were a few. That's what I'm uncertain of right now as to whether there were any overlapping. But I think the analysis there is that in terms of what was brought before the court, in terms of new documents, the travel documents, the photographs, those were all operational file information. Okay. What about just the delay? I mean, you get the request in July. And I think the agency response is four months later as against a 20-day deadline. And then the suit gets filed. And even then, the first tranche of documents isn't provided until a year after the suit is filed. Right. And I think the court responded in a likely fashion that it will respond today, is that this is the reality of the FOIA litigation today, is that it's not a matter of obduracy or recalcitrance, which implies some purposeful gaming of the system. But instead, it's a reality of resources and the unavailability of providing funds and manpower to respond within the 20-day time limit of the statute. But even in that context, the delay itself was born in part of the now misinterpretation of the CIA's responsibility to respond directly to the actual FOIA request, as opposed to allowing the JFK Act to handle JFK assassination-related material. In that sense, that that error added to the time that it took to respond completely to the FOIA request. And the only other factor... If your opening position was, this is a JFK request, those JFK records go through NARA and we don't have to search, it would seem like that's a pretty easy one to answer pretty quickly. And limited resources is not a great excuse when all you're doing is saying, we don't have to run any searches because the JFK Act makes these records available at NARA. Within the FOIA request itself, as the Court knows, that there were not just a paragraph indicating we would like JFK or JFK assassinations-related material. There were many sub-paragraphs and many different angles that had to be analyzed in order to make sure that there weren't any other requests that could be handled by the CIA. I believe that after the analysis of the letter, in regards to the sub-paragraphs of information that helped to guide the CIA in its ultimate decision, that that was the time that it took to respond to the request. But to the extent the request on its face is much broader than JFK documents, it's everything about Joe and Edie's, Doesn't that cut against the reasonableness of your response of, this is about JFK, go to NARA? Wouldn't there have been a lot of agency records about Joe and Edie's that had nothing to do with JFK that would have been responsive to the request? In this case, Your Honor, it took time to coordinate with other personnel within the CIA to really establish the connection, if there was one, to Mr. Joe and Edie's and the JFK assassination. In this instance, there was an entire review board that poured through the files of Mr. Joe and Edie's, searching for just these types of documents. This effort may not have been immediately available to the initial reviewer of the letter, but after analysis, it was determined that, in fact, all of the subparagraphs appeared to be subsumed in what would have been provided to the JFK assassination files. It was only after that analysis that we made the decision. You do the analysis, you look at all the subparts and pieces of it, and it takes a lot of work, but you eventually conclude that all agency records regarding Joe and Edie's either have gone to CIA through JFK or are operational files, and you have your legal position on that. That's correct. In terms of the other factors, briefly, I see my time is up. You can take another minute or two. Thank you, Your Honor. In terms of the public benefit factor, I believe that the only issue that we would like to highlight with that is that this court indicated that after an analysis ex ante of the FOIA request, indicating that it had a decent chance to provide new and useful information, that the analysis ends there with the public benefit analysis. And then the district courts are to use whatever decisions they have with regard to that particular factor in the overall balance of the four factors. Do you think on the commercial benefit factor where the district court says that there's going to be a commercial benefit because of some compensation for writing news articles, do you think that's correct analysis? Well, in terms of ultimately being compensated for the articles, I'm not aware of any payment records for that to establish that. No, I'm saying that shouldn't count as commercial benefit, correct? In terms of receiving remuneration for the information being published? Well, I would believe that that's akin to any movie deals or book deals that an author may have that the information is going towards that particular remuneration. I don't have any evidence that Mr. Morley was actually paid for these articles, but I believe the analysis is the same, that if there were to be any remuneration, it would be along the lines of using this information to provide a paycheck for that information in exchange. But I think ultimately the amount of what was actually provided to Mr. Morley was not determinative of any particular factor. I think the court, the district court itself said it was a small, if anything, it was small, and that while it augured in the benefit of the government slightly, it was just as slight as what the district court thought was the actual public benefit analysis. Do you think when a district court concludes the fourth factor favors the government, can it ever be an abuse of discretion on appeal for the district court to have denied the fees? Ever. Certainly, I can imagine circumstances where it could be in terms of having an analysis where the other three factors weigh heavily for the plaintiff. But in this case, I believe that the issue is that there wasn't any ultimate decision that this factor was determinative or dispositive and that the other analysis did not count. You don't think enough said was determinative? When the district court said enough said, exclamation point? I believe the court was referring to all the factors and not just one factor.  Thank you very much. Thank you, Your Honor. I do have one question for Mr. Peterson, and that is, in view of, I think it's more of a nine. Anyway, it's Judge Williams' writing. In view of that statement that showing potential public value in this case is relatively easy, that's not law in the case, I know, but are you seriously saying that the public value or benefit is, what, minimal or what? In view of this statement that we've already characterized public benefit as being relatively easy to show. Right. Your Honor, if I understand your question, the district court did not state that the public benefit itself was implausible. To the contrary. I thought it said it was slight. That's when viewing it in weighting the four factors. I believe that's the context in which the district court used that terminology in weighing the factors. No, it just says it was small, period. Are you talking about the public interest? Right. I find that the expectation adjusted value of the public benefit that plaintiffs sought to provide was small. That's not in context. That's just in and of itself. Right. And in and of itself, I believe that in that same portion, I believe that it was referring to and turning to the analysis of weighing the four factors. So in this case, I believe that the court. That's the next paragraph. That's true. Yes. So I believe that there wasn't a separate paragraph for weighing the public benefit factor, other than the fact that it indicated it was small. You're saying that we said it was easy to show, but the district court said it is, but it's small. I believe that's the ultimate position of the district court. All right.  Thank you, Your Honor. Yes. I would like to respond to Chief Judge Henderson's comment about the ‑‑ it turns out that the number of documents withheld in full purportedly because of the JFK Act were initially 700 and later 774. That information was produced in this lawsuit. The CIA testified to it. Then the numbers kept changing, and the National Archives later changed it to something like 3,000 withheld in full. They didn't discuss the number of partially withheld documents. And the fact now is that it's public knowledge that the National Archives itself has admitted that there are thousands of documents that were withheld, including tens of thousands of pages that were withheld under the JFK Act. The CIA ‑‑ I'm sorry. I'm just not following. NARA is doing a review of ‑‑ First of all, let me say that the most crucial point here is that the photograph of Joe Anides was released as part of the release of administrative records, not operational records. And secondly, the review board, there's an affidavit in the record by Judge Thunheim in which he says that if the review board had known what he came to know as a result of Morley's work in this litigation, that the review board would have ordered them all released. Now, the other point here is that the representation ‑‑ But are you talking about records that were in the CIA files and never transferred to NARA? The agency has never made it clear. It says that they were transferred and that they were available online at NARA. Now, it's not true that they were available online at NARA. All NARA had was a RIF, a research identification form. You could go to the RIF and see what the subject pertained to, although there are all kinds of errors in that. That's why we now know that there are scabs of missing and unaccounted for, unaccounted for documents. There are documents under the JFK Act process in order, the CIA main control, because it claimed that they were classified. The agency that classifies information has control of them. Of records transferred to NARA? Of records transferred to NARA. The reason NARA had not met the October 26, 2017 deadline is because the agencies had not acted to allow NARA to release the stuff to the public. That's the pure and simple what was going on. You're over your time. Is there anything else you want to say in rebuttal? I think that's it if you don't have any more questions. Thank you. The case is submitted.
judges: Henderson, Kavanaugh, Katsas